467 P.2d 238

**STATE of Arizona, Appellee,**

**v.**

**John Martin LINSNER, Appellant.**

**Nos. 1804, 1805.**

Supreme Court of Arizona,
In Banc.

April 2, 1970.

Gary K. Nelson, Atty. Gen., Darrell F. Smith, Former Atty. Gen., by Carl Waag Phoenix, Asst. Atty. Gen., for plaintiff.

Vernon B. Croaff, Public Defender, by Lou Zussman, deceased, Chief Trial Deputy, Stephen L. Cox, Robert Grygiel, Lewis, Roca, Beauchamp & Linton by John J. Flynn, Phoenix, for defendant.

John Martin Linsner, in pro. per.

STRUCKMEYER, Vice Chief Justice.

These consolidated causes are before this Court on appeal from the judgments and sentences imposed upon pleas of guilty to the crimes of robbery and assault with intent to commit murder.

On February 17, 1967, an information was filed in the Superior Court of Maricopa County charging the defendant, John Martin Linsner, with the crime of robbery, a felony, being Superior Court No. 51075. Defendant was arraigned on February 24, 1967, and entered a plea of not guilty. On March 22, 1967, an information was filed charging the defendant with the crime of assault with intent to commit murder, being Superior Court No. 51416. On March 23, 1967, the defendant withdrew his pleas of not guilty to both charges and entered pleas of guilty. The trial court, Division 2, accepted the pleas of guilty and ordered Superior Court criminal cases numbered 51051, 51040, 51005 and 51414 dismissed at the time of defendant's sentencing.

In Division 3 after probationary violation defendant was sentenced in causes numbered 48146 and 50172 for a period of not less than nine (9) nor more than ten (10) years, said sentences to run concurrently. On April 20, 1967, defendant was sentenced by the trial court in Division 2 for a term of not less than forty (40) nor more than fifty (50) years in the state penitentiary for robbery, the sentence to run consecutive to the sentences in Division 3, and for a term of not less than forty (40) nor more than fifty (50) years for the crime of assault with intent to commit murder, the sentences to run consecutively to the robbery sentence. Simply stated, defendant is serving two (2) concurrent sentences of nine (9) to ten (10) years to be followed by a sentence of forty (40) to fifty (50) years, then to be followed by another sentence of forty (40) to fifty (50) years.

Defendant urges that the trial court greatly abused its discretion in making both sentences of forty (40) to fifty (50) years run consecutively with the two concurrent sentences of nine (9) to ten (10) years, and consecutively with each other.

Defendant contends that the penalties would not have been as severe had it not been for allegedly highly inflammatory and prejudicial publicity by the newspapers, radio and television broadcasts, discussions by courthouse attaches, law enforcement people and other throughout the courthouse in Phoenix up to the time of the pronouncement of the sentences. It is argued that the defendant's sentence was aggravated by pre-trial publicity reflecting defendant was involved in the burglary and "great escape" from the Juvenile Detention Home in January 1967, and that the charge of assault with intent to commit murder had as its victim a deputy sheriff in the Maricopa County Jail whom defendant stabbed in the throat with a sharpened spoon while in custody. The essence of his argument is that his sentences are excessive and, consequently, constitute cruel and unusual punishment.

A.R.S. § 13–1717 deals with the power of this Court to correct and reduce a

sentence upon appeal by a defendant. It provides:

"B. Upon an appeal from the judgment or from the sentence on the ground that it is excessive, the court shall have the power to reduce the extent or duration of the punishment imposed, if, in its opinion, the conviction is proper, but the punishment imposed is greater than under the circumstances of the case ought to be inflicted. In such a case, the supreme court shall impose any legal sentence, not more severe than that originally imposed, which in its opinion is proper. Such sentence shall be enforced by the court from which the appeal was taken."

The policy behind the application of this statute was stated in State v. Maberry, 93 Ariz. 306, 309, 380 P.2d 604, 606:

"Because a defendant appears in person before the trial judge, the trial judge is, in most instances, better able than we to evaluate him and to determine what is necessary to rehabilitate him to constructive activity. It is for this reason that the legislature has given the trial court wide discretion to sentence a defendant for a period somewhere between a statutory minimum and a statutory maximum. * * * We have traditionally been prone to uphold a sentence declared by a trial judge when it is in conformity with the statute and there is no clear evidence that he had abused his power in the particular case." (Citations omitted.)

We have repeatedly held that the imposition of a sentence which is within the statutory limit does not constitute cruel and unusual punishment if the statute prescribing the punishment for such offense is constitutional. State v. Smith, 103 Ariz. 490, 446 P.2d 4; State v. Howland, 103 Ariz. 250, 439 P.2d 821. We have also held that the power to revise and reduce sentences imposed by the trial court should be used with great caution and exercised only when it clearly appears that a sentence

is too severe. State v. Valenzuela, 98 Ariz. 189, 403 P.2d 286. And see State v. Smith, supra.

■ It is apparent that the trial judge sentenced the defendant for a term of years greater than his life expectancy. We do not think this necessarily constitutes an abuse of discretion considering the defendant's past criminal activities, the nature of the offenses here involved, and his consistent antisocial attitudes. c. f. State v. Cuzick, 97 Ariz. 130, 397 P.2d 629.

Defendant urges that his pleas of guilty were involuntary because they were not intelligently made. As stated, defendant had been sentenced to imprisonment in the Arizona State Penitentiary for terms of 9 to 10 years after probation violation. The trial judge, the Honorable Donald Daughton, was aware of this and emphasized the possibility of lengthy sentences by personally interrogating the defendant at the time of his pleas of guilty in this manner:

"THE COURT: You understand the consequences of pleading guilty to a felony?

MR. LINSNER: Yes, I do.

THE COURT: Do you understand that if the Court allows you to enter a plea of guilty to a robbery and a separate plea of guilty to assault to commit murder that it would be within the power of the Court to sentence you to two consecutive life sentences which would run consecutive to the sentence that you have now been given by Judge McCarthy?

MR. LINSNER: Yes, I understand that."

And:

"THE COURT: What I am trying to say is that do you understand that upon these two pleas of guilty it may well be that you will spend the rest of your natural life in prison?

MR. LINSNER: Yes, sir."

The court adequately apprised Linsner of the possible sentencing consequences on the robbery charge:

"THE COURT: Are you guilty of this robbery, 51075?

MR. LINSNER: Yes, I am.

\* \* \* \* \* \*

THE COURT: This question may seem rather difficult but do you know you may end up spending the rest of your life—

MR. LINSNER: I am guilty, Your Honor."

He thoroughly apprised defendant of the possible sentence on a plea of assault with intent to commit murder:

"THE COURT: Cause 51416, State of Arizona vs. John Linsner, you are accused of assaulting one Jim Arleth with intent to commit murder. Do you recall that?

MR. LINSNER: Yes, I do.

THE COURT: It is your desire to enter a plea of guilty on that offense?

MR. LINSNER: Yes, it is.

THE COURT: What did you assault Mr. Arleth with?

MR. LINSNER: It was a sharpened end of a spoon.

THE COURT: Did you intend at that time to kill him?

MR. LINSNER: Yes, sir.

THE COURT: Where was that?

MR. LINSNER: In the county jail.

THE COURT: Do you understand that should you plead guilty on that charge it would be within the power of the Court to sentence you to life imprisonment?

MR. LINSNER: Yes, sir."

█ The record of defendant's arraignment on the charges herein establishes that both counsel and the trial judge had advised Linsner of the consequences of his plea. We think the language of the sentencing judge cannot be misunderstood. It conclusively established that Linsner intelligently entered his pleas of guilty to robbery and assault with intent to commit murder. State v. Griswold, 105 Ariz. 1, 457 P.2d 331. Defendant is not an illiterate. His education included one semester of college. It is difficult to imagine how an accused could have been more clearly apprised of the possible consequences of pleas of guilty.

█ Defendant asserts that his pleas of guilty were otherwise involuntary. Current law on guilty pleas places almost exclusive emphasis upon the need that guilty pleas be in every respect voluntary. The reason for this is clear for *a guilty plea differs in purpose and effect from an extra-judicial confession or admission because the plea is itself a conviction and like a jury verdict is conclusive.* Machibroda v. United States, 368 U.S. 487, 82 S.Ct. 510, 7 L.Ed.2d 473; c. f. State v. Anderson, 96 Ariz. 123, 392 P.2d 784; Cuzick v. State, 4 Ariz.App. 455, 421 P.2d 537.

██ A defendant must enter a guilty plea freely and voluntarily with understanding of the nature and consequences of the plea. State v. Willard, 102 Ariz. 271, 428 P.2d 423; Machibroda v. United States, supra; Kercheval v. United States, 274 U.S. 220, 47 S.Ct. 582, 71 L.Ed. 1009. That is, a plea must not be "induced by promises or threats which deprive it of the character of a voluntary act." Machibroda v. United States, supra. But since *a plea of guilty waives production of all evidence of guilt,* State v. Lopez, 99 Ariz. 11, 405 P.2d 892, more is required in the acceptance of such a plea for the court has thereafter nothing to do but give judgment and sentence. What is required is the certainty that the plea was intelligently and voluntarily made. Kercheval v. U. S., supra; Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274.

Petitioner contends that his guilty pleas were involuntary because the circumstances surrounding his incarceration in the Maricopa County Jail were such that he was coerced into pleading guilty out of fear for his life. When the thrust of defendant's contention became apparent, this Court

entered an order returning the matter to the Superior Court of Maricopa County for the limited purpose of determining whether Linsner was coerced into pleading guilty in accordance with his assertions.

On July 31, 1969 and August 1, 1969, the trial court held a hearing on the issue of coercion. The evidence received established that defendant had suffered a gunshot wound prior to his confinement in the Maricopa County Jail. Evidence was also received on the mental and physical pain and the persecution which he allegedly was subjected to in the Maricopa County Jail which might have influenced the entrance of a plea of guilty in order to get out of jail. Such a hearing was held to be the appropriate procedure in State v. Griswold, supra.

The trial court concluded as a matter of law that the defendant was not coerced into pleading guilty by reason of any mental or physical pain which he was subjected to in the County Jail. It made the following findings of fact:

"After considering all of the evidence and giving consideration to the credibility of the witnesses, the Court finds as follows:

The defendant had suffered a voluntary infliction of a gunshot wound prior to being jailed.

The Court further finds that the self-inflicted gunshot wound of the defendant was treated at the County Hospital originally, and he was taken back there several times for further treatment after he was jailed.

Dr. Taber, jail doctor, treated the Petitioner several times. Dr. Taber stated he discontinued any treatment for the gunshot wound on or about February 1, 1967, as the wound had healed.

Doctor Taber thereafter treated the Petitioner for other ailments up to March 24, 1967.

The defendant never complained of any mistreatment to Doctor Taber. Doctor Taber saw him in jail sixteen or seventeen times for treatment of various complaints of Petitioner. These visits are in addition to the visits the defendant made at the County Hospital for treatment to the wound.

The defendant was subjected to punishment in the County Jail by the deputies, but same was done as a disciplinary procedure, when this defendant constantly caused trouble and disturbed the other prisoners and violated prison rules.

The defendant was not persecuted by the jailers or deputies, but their actions were disciplinary in nature.

After the defendant once settled down and quit his disturbances, he had no further difficulty with the deputies and jailers.

On March 23, 1967, the date the defendant entered the pleas of guilty before Honorable Donald Daughton, he wrote a lengthy letter to Judge Daughton (in evidence at the hearing as State's Exhibit No. 2) in which he said in part as follows:

'I plead guilty today in your court to two charges, ones that I am in no way proud of. I guess you wonder sometimes what makes a youngster like myself 'go off of the deep end'. You know, I wonder myself. I committed some very serious crimes and now I am going to have to do a long term in prison, I understand that and I understand why.'

These do not sound like the words from the pen of a man who was coerced into pleading guilty. Nowhere in the long letter is there the slightest indication that this defendant harbored the slightest idea that he was coerced into pleading guilty as he now claims in his petition filed in the Supreme Court.

Unquestionably, after the long sentence handed down by Judge Daughton and after a period behind the bars at the State Penitentiary, the defendant now has some different reflections on his past. He stated at this hearing that he probably would lie to get out of the

pen, however, he stated he was not lying on the stand."

The defendant in propria persona states his position as follows:

"It is the position of the defendant that, if nothing else, the hearing on coercion held before Judge Glenn brought out many strong points which tend to show an overall picture that could all too likely—or even just possibly—show a network of events—whether 'punitive' or purposfull (sic); entirely true or partially true; blameful or non blameful —created circumstances that would cause the average person enough stress to succumb to those circumstances merely for mental relief at finding a compromise of which could at least be appealed should it (the compromise) not be fulfilled."

The defendant claims that he was promised by his counsel that a lesser sentence would be imposed ten minutes before he plead guilty. He testified on direct examination:

"Q.: Why did you enter pleas of guilty on March 23rd to charges in Cause Number 51075 and C.R. 51416?

A.: Because I was promised two 10 to 12 terms to run concurrently with the 9 to 10 that I already had; and because I wanted to get out of the Maricopa County Jail."

■ But thereafter Linsner invoked the attorney-client privilege when it was proposed that his former defense counsel testify as to whether he had promised defendant his sentences would run concurrently. Defendant would now have us accept his unsupported statement that he was induced to plead guilty because he was promised a lighter sentence. The trial judge did not believe defendant and this Court will not re-try that issue. State v. Hughes, 104 Ariz. 535, 456 P.2d 393.

Pleas arising from a bargain or alleged bargain with the prosecutor often find their way into litigation. This case illustrates a frequent situation involving plea bargaining where the prosecutor promises to make some concession other than a sentencing recommendation, such as dismissal of certain counts in the indictment to which the plea is made. In the instant case, four other charges were dismissed.

■ In Cortez v. United States, 337 F. 2d 699 (9th Cir., 1964), page 701, it was stated:

"*We take judicial notice of the fact that the vast majority* of those who are indicted for federal crimes *plead guilty.* We know, too, that *in many of the cases where this occurs the plea will be to one count, or less than all counts, of a multi-count indictment,* or to a lesser offense than that originally charged. In a sense, it can be said that most guilty pleas are the result of a 'bargain' with the prosecutor. But this, standing alone, does not vitiate such pleas. *A guilty defendant must always weigh the possibility of his conviction on all counts, and the possibility of his getting the maximum sentence, against the possibility that he can plead to fewer, or lesser, offenses, and perhaps receive a lighter sentence.* The latter possibility exists if he pleads guilty, as Cortez did, to the whole charge against him." (Emphasis supplied.)

The defendant did not receive the lighter sentence he was hoping for, but this does not render his plea involuntary. See, Silver v. State, 37 Ariz. 418, 295 P. 311.

We next come to the issue of whether the defendant was coerced into pleading guilty for fear of his life or of physical abuse. Defendant asserts that he was physically abused in the Maricopa County Jail and that "I advised Mr. Zussman (attorney for the Public Defender's Office) but he did nothing about it." When asked by the prosecution whether defendant had directly complained to defense counsel of ill-treatment, Zussman stated defendant had never directly complained to him nor could he recall that Linsner had written complaining of mistreatment in any of his numerous letters to the Public Defender's Office. Nor did he complain of mistreat-

ment in a letter written to the sentencing judge.

█ We express no opinion as to defendant's claims of cruel and unusual punishments in the light of defendant's obvious need for disciplinary action, and no opinions as to what conditions qualitatively must exist to constitute violations of constitutional standards. As a general rule, prison authorities are given wide discretion as to the treatment of prisoners. Snow v. Gladden, 338 F.2d 999 (9th Cir. 1964). This does not mean that discretion in this area is incapable of abuse, but the extent of the defendant's punishment for violation of jail discipline is collateral to this inquiry except insofar as it relates to his charge of coerced pleas of guilty.

The important point, we think, is that between the time of the alleged mistreatment and the pleas of guilty nearly one month elapsed during which defendant was in no way abused. Moreover, four weeks then elapsed before sentence was imposed.

Defendant testified on cross examination that no incidents took place because he and the jailers had agreed to a mutual peace:

"Q You just testified on direct examination that after February 25th or 26th you received no further mistreatment in the Maricopa County Jail from the deputy jailers.

Isn't that your testimony?

A Towards the first of March.

Q After that period of time you were treated like any of the other men who were incarcerated in our County Jail?

You were fed, clothed, you had visitors as you testified before?

A Yes.

*This was under an agreement between myself*—of myself and the officers verbally.

Q And you entered your plea on March 23rd, 1967.

Do you recall that particular date? That's the date you mention in the Pleadings.

So, that's almost a month after the last time you testified to of these incidents that took place.

Is that correct?

You will have to speak audibly so she can take it down.

A Yes.

Q Then after your sentencing on— the time you plead guilty on *March 23rd* to the date of *April 20th,* I take it there were no incidences that took place in the jail during that period of time before you were sentenced.

You have not testified to anything concerning any incidences that took place.

A Because no incidents took place." (Emphasis added.)

█ In light of this testimony and the length of time between the alleged mistreatment and the pleas and the subsequent sentences, the finding of fact of the court below that defendant was not in fear for his physical safety to the extent that it had a compelling influence on his decision finds ample support.

█ Where there is reasonable evidence to support the factual finding of the trial court, we will not disturb that finding on appeal. See State v. Sherron, 105 Ariz. 277, 463 P.2d 533. The weight given to the testimony of the witnesses is for the trial court and we do not re-try the issues determined below lacking obvious error. State v. Sanders, 101 Ariz. 410, 420 P.2d 281.

Inasmuch as there is substantial evidence to support the trial court's findings of voluntariness, the judgments are affirmed. c. f. State v. Denton, 101 Ariz. 455, 420 P.2d 930.

Judgments affirmed.

UDALL, McFARLAND, and HAYS, JJ., concur.

LOCKWOOD, C. J., did not participate in the determination of this matter.